**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 01-20659

TEST MASTERS EDUCATIONAL
SERVICES, INC.,

Plaintiff - Appellee -
Cross-Appellant,

versus

ROBIN SINGH, doing business
as Testmasters,

Defendant - Appellant -
Cross-Appellee.

ROBIN SINGH, doing business
as Testmasters,

Plaintiff - Appellant -
Cross Appellee,

versus

TEST MASTERS EDUCATIONAL
SERVICES, INC.; VIVEK ISRANI,

Defendants - Appellants -
Cross-Appellees.

Appeal from the United States District Court
For the Southern District of Texas
(No. H-99-CV-2781)
July 24, 2002

Before KING, Chief Judge, PARKER, Circuit Judge, and ELLISON,[*] District Judge.

PER CURIAM[**]:

Both sides in this complicated trademark case suffered a partially adverse judgment from which they each appeal. We reverse in part, vacate in part, and remand.

## BACKGROUND

This matter arises from competing claims to the domain name testmasters.com. Plaintiff is Test Masters Educational Services, Inc.[1] The company is in the test preparation business; it helps individuals pass or achieve higher scores on the SAT, GMAT, MCAT, and other standardized tests, and professional licensing exams, like the Professional Engineer Exam. Haku Israni ("Israni") started the company in 1991 and offered his first test prep course in March, 1992. In May 1994, Israni incorporated the business, making his son Vivek ("Roger") Israni its sole owner and president. TES has offered courses continuously since 1992. Most are taught in Houston, where the company is headquartered, but some have been taught in other cities around Texas. The

_____

[*] District Judge of the Southern District of Texas, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] The record shows that the company does business under its full name, but for the sake of simplicity we will refer to it by the acronym used by the parties in their briefs--"TES."

company has never taught any courses outside the state.

Defendant is Robin Singh.  He does business under the name TestMasters,[2] and like TES also offers test prep services.  His business is limited to the LSAT, however.[3]  Singh operates out of Beverly Hills.  He began business in 1991, and through 1996 only offered courses in California.[4]  He applied for federal registration of TestMasters on June 23, 1995.  His application was initially denied, the Patent and Trademark Office ("PTO") having found that three marks substantially similar to his had already been registered.  After determining that none of the three marks were still in use, the PTO approved Singh's application in March, 1999 (No. 2,234,514).[5]

In October 1995, several months after Singh applied for federal registration, TES acquired rights to the domain name at issue.  At first, TES used the domain name to operate a passive web page--that is, one that only shows information posted by its

---

[2]  The words test and masters are run together without a space, with the T and M capitalized.  Sometimes the mark appears in all capitals--"TESTMASTERS."

[3]  TES does not provide LSAT instruction.

[4]  In 1997, Singh offered an LSAT prep course in Colorado.  In 2000, he began offering courses in a number of states, including Illinois and New York and in the District of Columbia.

[5]  The mark is registered for use in connection with "educational services, namely, providing courses of instruction and materials to prepare students to take and achieve higher scores on standardized admission tests for graduate and professional schools."

sponsor.  The page listed the exams for which TES helped individuals prepare, gave the company's Houston address and toll-free phone number, and provided a link to the company's email address, info@testmasters.com.

In 1999, Singh decided to create his own web site, but soon discovered that TES already had the rights to testmasters.com. On August 7, his attorney sent TES a demand letter, claiming that its use of the domain name infringed on Singh's trademark rights. He promised to file suit if TES did not relinquish the domain name.  TES instead itself filed suit on August 30.  In its complaint, TES sought a declaration of non-infringement and asserted alternatively that Singh's mark was invalid for being descriptive without a secondary meaning and for Singh's having committed fraud on the PTO.  On June 30, 2000, Singh initiated a separate action against TES, alleging infringement and unfair competition under California law.  TES answered and asserted an additional defense--that it was an innocent prior user of its Test Masters mark.  The two suits were consolidated.  Following discovery, the district court granted summary judgment on the fraud claim, concluding that Singh had no duty to update his application with the PTO upon learning of certain others' use of similar marks.

The remaining claims were tried to a jury beginning February 5, 2001.  After a five-day trial, the jury found that Singh's mark was descriptive but that it had acquired a secondary

meaning; and that TES had infringed on Singh's mark but that TES was immune from liability as an innocent prior user. The jury also found that TES had "engaged in unfair competition in the State of California through the use of the domain name . . . ." In all relevant respects, the district court denied the parties' renewed motions for judgment as a matter of law. It subsequently ordered the director of the PTO to modify Singh's trademark registration to confer in TES the exclusive right to use its mark within Texas, in accordance with the jury's finding on the scope of TES's prior usage. The district court also ordered TES to transfer its ownership of testmasters.com to Singh.

Both sides appeal on numerous grounds.

### DISCUSSION

Trademark law protects buyers and sellers against confusion in the marketplace. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 9 cmt. c (1995)(hereafter "RESTATEMENT"). When a mark identifies the manufacturer of the product on which it appears, buyers can "base their purchasing decisions on the reputation of the business identified by the mark." *See id.* A distinctive mark is one that identifies the source of its user. *See Sugar Busters, LLC v. Brennan*, 177 F.3d 258, 268 (5th Cir. 1999). The holder of a distinctive mark can enjoin the use of similar marks that are likely to cause confusion. *See* 15 U.S.C. § 1114(1)(a). A descriptive mark, on the other hand, denotes "a characteristic or

-5-

quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983). It is not inherently connected with a particular seller and therefore buyers do not treat it as a proxy for anyone's products. *Cf.* RESTATEMENT § 13. Without an association between the mark and a seller in the minds of buyers, its use by multiple sellers will not cause confusion. *See* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:11 (4th ed. 1992)(hereafter "MCCARTHY").

A descriptive mark can acquire distinctiveness, however, if it attains a secondary meaning. *See* RESTATEMENT § 13(b). A secondary meaning arises "when, because of association with a particular product or firm over a period of time, the [mark] has in the mind of the public come to stand as a name or identification for that product or firm." *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 861 (5th Cir. 1967). Where consumers have made such a connection, subsequent use of similar marks may result in confusion. *See* 2 MCCARTHY 15:11. The question whether there "is a mental association in buyer's minds between the alleged mark and a single source of the product . . . is primarily an empirical inquiry." *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 253 (5th Cir. 1997)(internal quotations omitted). Thus, "survey evidence is the most direct and persuasive evidence of secondary meaning."

*Id.* at 253-54. Other kinds of evidence tending to show secondary meaning include "length and manner of the use of a mark, the nature and extent of advertising and promotion of the mark, and the sales volume of the product, and instances of actual confusion." *Id.* The holder of a descriptive mark has priority over another's use of a similar mark only in the area in which secondary meaning has been established. *See* 2 MCCARTHY § 16:34.

The fact of registration is prima facie proof that a registered mark is distinctive. *See Vision Center v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979)(citing 15 U.S.C. § 1057(b)). This presumption can be overcome by showing that the mark is merely descriptive. *See id.* The burden then shifts to the registrant to prove that the mark has acquired a secondary meaning. *See* 2 MCCARTHY 11:43. The burden is "substantial," *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir. 1984), requiring a "high degree of proof," *Sugar Busters*, 177 F.3d at 269. The proponent of a descriptive mark is not required to show that a majority of the buying public associates the mark with its business, but it must at least show that "a significant quantity of the consuming public understand a name as referring exclusively to the appropriate party . . . ." *President & Trustees of Colby College v. Colby College-N.H.*, 508 F.2d 804, 807 (1st Cir. 1975); *see* RESTATEMENT § 13 cmt. e. Failure to establish secondary meaning is grounds for cancellation of a

-7-

federal registration.  *See Zatarains*, 698 F.2d at 792 (relying on 15 U.S.C. § 1119).

Singh does not contest the jury's finding that his mark is descriptive.  Accordingly, we must only decide if the district court erred in not granting judgment as matter of law on the question of secondary meaning.  We review the district court's denial of judgment a matter of law de novo, applying the same legal standard as it did.  *See Cooper Indus., Inc. v. Tarmac Roofing Sys., Inc.*, 276 F.3d 704, 707 (5th Cir. 2002).  "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law . . . ."  FED. R. CIV. P. 50(a)(1).  To determine whether the evidence is legally sufficient we view it against the non-movant's substantive burden of proof.  *See* 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2524 (2d ed. 1994 & Supp. 2002).

Before proceeding to analyze the record on the question of secondary meaning, we first address and dispose of an argument advanced by TES in its briefs and during oral argument.  TES notes that the proponent of a descriptive mark must show that its mark established a secondary meaning before others began using it.  *See* 2 MCCARTHY § 16:34.  TES argues that its use of Test

-8-

Masters was first and that Singh cannot therefore establish secondary meaning. This would ordinarily be true--assuming for the moment that TES's use was indeed first-in-time--if TES and Singh were operating in the same geographic area. *See* RESTATEMENT § 13 cmt. e; 2 MCCARTHY § 16:34. But they do not: TES and Singh have their businesses far away from each other, and except for TES's use of the disputed domain name there is no claim by either party that the other had a presence in its market area. Thus, because TES never did business anywhere besides Texas, TES's having used its Test Masters mark first does not prevent Singh's mark from establishing a secondary meaning in California. *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415 (1916)("[W]here two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant . . . .").

At trial, Singh introduced four advertisements that appeared in the *Daily Bruin*, the student newspaper of the University of California at Los Angeles. The ads ran in 1994. All compare Singh's product to those of his competitors--namely, Kaplan and Princeton Review. One, for example, compares the features of each course (Singh's and the others') , including number of lecture hours, instructor qualifications, class size, and cost.

-9-

Two contain testimonials from satisfied customers.[6]  Another ad was apparently run in response to Kaplan's claims about Singh's course.  Singh testified that Kaplan as well as Princeton Review have referred to his company "hundreds of times" in their ads.

We conclude that these ads do little to prove that consumers in southern California--which we assume is Singh's product area for purposes of this opinion--have associated TestMasters with Singh's business.  The probative value of advertising depends on the presence of data regarding its reach, frequency, and duration.  *See* 2 MCCARTHY § 15:51.  In this case, there is no evidence regarding the *Daily Bruin*'s area of distribution, although it likely does not extend beyond the UCLA campus and its environs.  Further, it appears that the four ads in question ran within just a few months of each other in 1994--a fact that hardly suggests a lasting campaign of product promotion.  As for the testimonials, all told the ads contain only five.  Obviously, testimonials that are few in number or do not otherwise fairly represent the public's sense regarding a descriptive mark have little probative value regarding secondary meaning.  *See* RESTATEMENT § 13 cmt. e.  The record reveals no other evidence of advertising, nor has Singh directed our attention to any.

---

[6]  This one is typical: "I commuted from Santa Barbara to take the TestMasters LSAT Course, and believe me, it was worth it. Nobody else could have taken me from a 157 (75th percentile) to a 166 (95th percentile)."  TES has waived any challenge to the admissibility of these statements.

(Indeed, Singh's brief on this issue contains no record citations at all.)  Regarding Kaplan's and Princeton Review's advertising, instances where third parties have used a descriptive mark to refer to its holder may constitute evidence of secondary meaning. *See American Heritage Life Insur. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 13 (5th Cir. 1974).  There is no direct evidence of any such references in this case, however.  And as with Singh's own ads, the record is silent regarding how prevalent they were.

On the other hand, there is evidence that some would-be customers contacted TES but meant to contact Singh's business instead.  Such evidence tends to show that the public has connected the TestMasters mark with Singh's business.  *See* 2 MCCARTHY § 15:11 ("[I]f buyers are confused, then this also means that they must have recognized plaintiff's word as a trademark and associated it only with plaintiff.").  The evidence is in the form of forty or so email messages from individuals interested in taking an LSAT prep course.  The first messages are dated May and June, 2000.  Most are from individuals writing from California. In some messages, it is clear that the writers specifically intended to contact Singh's business, as opposed to merely inquiring whether TES itself offered LSAT preparation.[7]  But the

---

[7]    For example, one reads: "I plan to take the June 2001 LSAT exam.  A co-worker of mine recommended that I contact you.  She took your LSAT prep course and will be attending the University of Michigan in the Fall!  I am very interested in your services and would like to receive some information."  Another reads:  "I

majority of email messages are more ambiguous.  Typical is this one: "I was interested in finding out some information about your lsat course."  Such messages--there are about twenty or so like it--indicate that the writer understands that the addressee in fact offers an LSAT prep course ("*your* LSAT course").  Of course the addressee in this case--TES--does not, which may suggest the writers intended to contact Singh's business in the first place.  A third class of messages shows no evidence of confusion at all.  These messages simply request information about LSAT prep courses, but in no way demonstrate extant knowledge about the addressee's business.  One for example says: "I was wondering if you offered courses for LSAT prep?"  In response to all of these messages, TES, through its attorney, wrote that it does not offer LSAT courses, and sometimes said, "I think the company you are looking for is www.testmasterslastprep.com"  (i.e., the web site address for Singh's business).  Other responses referred the sender to Singh's page as well as to Kaplan's and Princeton Review's.

We conclude that these email messages are some evidence that Singh's mark has established a secondary meaning.[8]  But we must

signed up and took your LSAT course in the summer of 1999 at Bo[a]lt Law School, UC Berkeley.  I decided against taking the exam last year and would like to take it this year.  I understand if I already payed for the course the first time it is much cheaper to retake it. . . ."

[8]  It is unclear when TES first established a web page at testmasters.com.  If it did soon after it acquired rights to the

evaluate this evidence against Singh's overall substantive burden of proof--which as we noted is quite high. Besides the above-discussed messages, there is little or no evidence regarding secondary meaning. We have already commented on Singh's evidence of advertising and product promotion. Additionally, Singh has introduced no evidence of his sales and revenues. Such data would help us understand Singh's market penetration. Furthermore, Singh has failed to offer any survey evidence--a fact though not fatal substantially diminishes the overall strength of his proof in a case as close as this one. Other kinds of helpful evidence are also lacking. For example, if Kaplan and Princeton Review are as familiar with his business as he claims, testimony from their representatives would help show Singh's business is well-established and prominent. Additionally, he could have secured affidavits from individuals who have learned of his business through word-of-mouth or personal experience. Simply put, Singh has failed to show that "a significant quantity of the consuming public" associates the TestMasters mark with his business. We are therefore constrained to conclude that the district court erred in denying TES's Rule 50 motion on the question of secondary meaning.

Having determined that Singh's mark has not established a

---

domain name, in 1995, as some evidence indicates, then the fact that there is no evidence of confusion from 1995 until mid 2000 suggests that the email messages discussed above are anomalous.

secondary meaning, we vacate judgment for Singh on his common law unfair competition claim. The district court instructed the jury that to find TES liable for unfair competition under California law Singh had to show that TES's "actions are likely to cause confusion, or to cause mistake, or to deceive . . . ." For any of these things to occur, consumers must first "be looking for" the TestMasters mark. *See* 2 McCarthy 15:11 (internal quotation omitted). Because Singh has failed to prove that individuals in southern California "look for" Singh's mark, "no act of [TES's] can operate to deceive the public in its identification of [Singh]" *Id.*

## CONCLUSION

In light of the foregoing, we REVERSE the district court's denial of TES's motion for judgment as a matter of law on the issue of secondary meaning. We VACATE its judgment for Singh for unfair competition under California law and RENDER for TES instead. We VACATE its order compelling TES to relinquish the disputed domain name. Finally, we REMAND for entry of a order that Singh's trademark is invalid. *See* 15 U.S.C. § 1119.

-14-